```
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
```

UNITED STATES OF AMERICA )
                         )     CRIMINAL NO. 04-10168-PBS
        v.               )
                         )
NORMAN BARNES,           )
        Defendant        )
                         )

**Government's Sentencing Memorandum**

**Introduction**

The United States of America, by Michael J. Sullivan, U.S. Attorney, and Michael J. Pelgro and David G. Tobin, Assistant U.S. Attorneys, hereby submits this sentencing memorandum to aid the Court in its disposition of the above-captioned action.

**The Applicable GSR**

<u>The Base Offense Level</u>

There is no dispute that, on the night of April 12, 2004, Barnes and his cohorts sold to Drug Enforcement Administration ("DEA") undercover agent David DiTullio 28.2 grams of cocaine hydrochloride, which equates to Base Offense Level ("BOL") 14 under the Sentencing Guidelines. *See* PSR at ¶¶ 50-52. At the jury trial of defendant Tavon Robinson ("Robinson"), however, defendant Adam Ellard ("Ellard") testified that, approximately five or six days earlier, he had observed Barnes and defendant Willie Hester ("Hester") packaging 3.5 grams of "crack" cocaine for resale. The government has dealt with the issue of drug quantity, and has submitted to the Court a transcript of Ellard's

trial testimony, in its filing on January 26, 2005.  Accordingly, the government respectfully refers the Court to the Government's Submission Filed Under Seal In Support Of Its Position At Sentencing.[1]

Role Adjustment

The government contends that Barnes should receive a four-level upward adjustment as an organizer or leader of criminal activity involving five or more participants.  *See* U.S.S.G. § 3B1.1(a).  Barnes contends that he should receive a two-level reduction as a minor participant.  *See* U.S.S.G. §3B1.2(b).  The Probation Department has taken no position on this issue.  *See*

---

[1] In response to Barnes's contention that Ellard's testimony is not adequately corroborated or legally sufficient, the government would point out that Barnes's mother and her long-time male companion, who was the registered owner of the Honda Civic driven by Hester, both told the government, and testified before a federal grand jury, that Barnes and Hester had been close friends for years and that they both had access to, and use of, the Honda Civic driven to the drug deal by Hester.  *See* PSR at ¶¶ 37-38.  The DEA agents who took custody of the automobile on April 12, 2004 recovered personal papers belonging to both Barnes and Hester from the glove compartment, including a traffic ticket issued to Barnes a week earlier.  *See* PSR ¶ 22.  The government submits that this additional information adequately corroborates Ellard and further establishes that Barnes and Hester were engaged in "jointly undertaken criminal activity" when they sold what was represented to be crack cocaine on April 12, 2004 and when they possessed crack cocaine less than a week earlier.  *See* U.S.S.G. § 1B1.3 (a)(1)(B).  Further, as set forth below, both Barnes and Hester were arrested by the Boston Police Department in the early-morning hours of February 9, 2002 as they were driving a Honda Civic in possession of 17 bags of suspected crack cocaine.  This incident resulted in the defendant's conviction for possession of a Class B controlled substance in January 2003.  *See* PSR at ¶ 64.

2

PSR at ¶ 54.

As set forth in its earlier filing, based on Ellard's trial testimony, Barnes was in control of this drug deal at all relevant times. Contrary to Barnes's contention in his sentencing memorandum, Ellard's role was not more culpable and involved than that of Barnes. Ellard was clearly the middleman in this drug deal. His role was more exposed than that of Barnes and he clearly assumed more risk than Barnes did. But, as this Court is well aware, it is often the lower-level participants in drug deals who take on the roles that expose them to greater risks than the supervisory participants. That was Ellard's role in this case; he was certainly below Barnes on the culpability scale.

Ellard testified at Robinson's trial that when Agent DiTullio refused to "front" the money to him, he had to go back to his co-defendants to work out a suitable arrangement. He naturally went first to Hester, his connection, the person he had contacted earlier that day to set up the deal. Significantly, Hester demonstrated that he had no authority at all; he directed Barnes to talk to the man sitting in the back seat of the silver Ford Focus – Barnes. Ellard then went over to the passenger side of that automobile and spoke to Barnes, who simply stated that he

would not release the drugs without seeing the money first.[2] This clearly demonstrates Barnes's control over the deal and his exercise of decision-making authority. The only real decision of any consequence in this simple drug deal was whether the money or the drugs would be released first or simultaneously. It was Barnes who made that decision. Ellard's testimony is corroborated by the testimony of Agent DiTullio and at least four surveillance agents who watched Ellard walk over to the silver Ford Focus, stand at the passenger side, and speak to the automobile's occupants.[3]

    To be sure, Ellard testified that he eventually became more involved conversationally with Robinson. But this was after Ellard had gone back to Agent DiTullio without success and after it appeared that the deal was not going to happen. The decision not to "front" the drugs was made initially by Barnes and everybody abided by that decision.

    Further, Barnes's claims at pp. 7-8 of his sentencing memorandum actually support the government's position on this

---

[2] Since Barnes knew that he was "ripping off" the purchaser, he had good reason not to compromise on this issue.

[3] It is the government's memory that Ellard, Agent DiTullio, and the DEA surveillance agents all testified that Ellard stood either at the rear of the car or in the middle between the front and the rear. In the final analysis, however, it makes no difference precisely where Ellard stood since he could easily speak to all three occupants of the silver Ford Focus no matter where on the passenger side he stood.

issue, not his.  The fact that Barnes had Hester negotiating with Ellard, that Barnes had Robinson driving the silver Ford Focus, and that Barnes had Robinson handling the drugs all point to Barnes's role as the supervisory participant making "the critical strategic and operational decisions in a group enterprise." United States v. Twitty, 72 F.3d 228, 234 (1st Cir. 1995)(*quoting* United States v. Talladino, 38 F.3d 1255, 1261 (1st Cir. 1994)). *See also* United States v. Gonzalez-Vazquez, 219 F.3d 37, 44 (1st Cir. 2000)(affirming role enhancement based on cooperating witness's trial testimony indicating that "the defendant, in committing the crime, exercised control over, or was responsible for overseeing the activities of, at least one other person.")(*quoting* United States v. Cali, 87 F.3d 571, 578 (1st Cir. 1996)).  Indeed, a defendant cannot immunize himself from a role enhancement by having others carry out the mechanics of the illegal conduct.  The courts have recognized that, like Barnes, "leaders and organizers often distance themselves from the actual implementation of the conspiracy."  United States v. Bass, 54 F.3d 125, 129 (3rd Cir. 1995).

    Dangerous Weapon Enhancement

The Probation Department has properly recommended that Barnes be given a two-level enhancement pursuant to U.S.S.G. §2D1.1(b)(1) because Barnes and/or his coconspirators jointly possessed, either actually or constructively, a firearm during

the drug offenses.

A two-level increase in offense level is required "[i]f a dangerous weapon (including a firearm) was possessed" in the course of a drug offense.  U.S.S.G. §2D1.1(b)(1).  In a conspiracy case, the government must first demonstrate that the defendant or one of the coconspirators "possessed a weapon during the offense."  United States v. Nelson-Rodriguez, 319 F.3d 12, 59 (1st Cir. 2003).  The possession of a firearm by a coconspirator is imputed to the defendant if it was reasonably foreseeable that a coconspirator would possess a gun in furtherance of the criminal activity.  United States v. Casas, 356 F.3d 104, 129 (1st Cir. 2004), citing United States v. Mena-Robles, 4 F.3d 1026, 1036 (1st Cir. 1993).  Under familiar principles, the two-level enhancement applies "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  United States v. May, 343 F.3d 1, 6 (1st Cir. 2003)(*quoting* United States v. Jackson, 3 F.3d 506, 509 (1st Cir. 1993)).  Once the government demonstrates possession of a firearm, the burden is on the defendant to show that the connection between the gun and the drug crime was "clearly improbable."  United States v. May, 343 F.3d at 6 (citations omitted).  The prosecution does not have to show that the defendant or his coconspirators actually used the gun in perpetrating the offense or intended to do so.  United States v.

Nelson-Rodriquez, 319 F.3d at 40, citing United States v. McDonald, 121 F.3d 7, 10 (1st Cir. 1997). Constructive possession of the weapon by the defendant or a coconspirator is, of course, sufficient to warrant the two-level sentencing enhancement.

    Barnes argues that it was not reasonably foreseeable to him that one of his coconspirators would bring a gun to the cocaine sale. This position is preposterous. The evidence overwhelmingly demonstrates that Barnes knew or could reasonably foresee that one of his coconspirators would bring a gun to the cocaine sale. This Court well knows that the sale of illegal drugs all too often, and frequently with tragic consequences, involves the possession and use of firearms. The drug industry is by nature dangerous and violent, and a reasonable fact-finder is permitted to use common sense in concluding that the presence of firearms is foreseeable in a drug deal involving sizeable amounts of money. See United States v. Berchiolly, 67 F.3d 634 (7rth Cir. 1995). The First Circuit has recognized that guns are commonly involved in drug offenses. "Like several other circuits, we often observe that firearms are common tools of the drug trade. Absent evidence of exceptional circumstances, we think it fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an

exchange of controlled substances for a large amount of cash (possession of firearm foreseeable where quantity of narcotics was 'sufficient to support an inference of intent to distribute").

Both Robinson and Ellard testified at Robinson's trial that drug deals are dangerous.  Similarly, there was police testimony at Robinson's trial that drug deals are inherently dangerous and frequently involve guns.  Given the nature of Barnes's criminal history, it is, at best, disingenuous for him to now claim that he could not reasonably foresee that one of his coconspirators would have brought a weapon to the deal.  The evidence strongly suggests that Barnes, Hester, Robinson, and Tucker all knew each other well and that they were jointly responsible for the presence of three firearms at the deal.  Two loaded handguns were found secreted in the engine of the car where Barnes sat, significantly in the same area in which the drugs had been secreted.  A third handgun was found in Barnes's mother's car, which was frequently driven by Barnes and Hester, his close friend and drug-selling partner.

Barnes's professed ignorance is even more absurd given the fact that Barnes and his coconspirators were intentionally short-changing both Ellard and the ultimate purchaser, Agent DiTullio. Ellard had made it perfectly clear that his customer was looking for two ounces of "crack" cocaine.  Hester negotiated to sell

Ellard two ounces of powder cocaine.  In the end, Barnes and his coconspirators transferred to Ellard only one ounce of powder cocaine.  Barnes and his coconspirators obviously had a need for handguns to protect themselves from reprisals by Ellard or the ultimate customer should either learn that they had been "ripped off" by Barnes and his coconspirators.  Moreover, since Barnes was clearly the leader in this drug deal, he would certainly have known that the group had firepower if things went bad.

<u>Criminal History Category</u>

At the age of 21, Barnes already falls within Criminal History Category ("CHC") IV due to his penchant over the last six years for committing serious crimes, often while on pretrial release or probation from earlier charges, and for violating terms of probation, resulting in sentences of incarceration. Barnes's contention that the "proper" CHC should be III because he disagrees with the methodology of the Guidelines is simply untenable.

Barnes focuses his argument on his juvenile convictions for receiving stolen property and credit card fraud.  *See* PSR at ¶ 61.  These offenses, which Barnes attempts to recast as "relatively minor" or not worthy of being scored, involved the breaking and entering of a student's locker at Brighton High School, the theft of a credit card, and the use of the credit card to purchase two "pellet pistols" that were delivered to the

9

residence where Barnes was staying. These felony crimes cannot be construed as trivial.

Moreover, what Barnes fails to point out is that, on March 9, 1998, Barnes was given a continuance without a finding for 18 months for these offenses. It was Barnes's violations of the terms of that disposition that led the court on November 17, 1999 to revoke the disposition, to adjudicate Barnes delinquent, and to impose a one-year term of probation. It was Barnes's violations of the terms of that disposition that led the court on March 10, 2000 to commit Barnes to the Department of Youth Services ("DYS"). Accordingly, the fact that the Guidelines' timing rules make these offenses countable is due solely to Barnes's repeated misconduct while under the state court's sentence.

It is undisputed that Barnes was sentenced to probation, that he violated the terms of his probation, that he was committed to DYS, and that he was released from DYS custody on May 30, 2000. Since his confinement exceeded 60 days and since he was released from such confinement within five years of his selling cocaine to Agent DiTullio on April 12, 2004, these offenses are counted as two criminal history points under U.S.S.G. § 4A1.2(d)(2)(A).

Barnes's suggestion that the Court should disregard this score because it somehow overstates the severity of his criminal

history or his risk of recidivism is also on shaky ground.[4] After receiving his continuance without a finding in March 1998, Barnes was arrested in June 1998 on firearms charges,[5] in April 1999 on armed robbery charges,[6] in April 1999 on cocaine distribution charges,[7] in November 1999 on marijuana distribution and possession of a dangerous weapon charges,[8] and in December 1999 on receiving stolen motor vehicle charges.[9]  It thus appears that Barnes's commitment from March 10, 2000 to May 30, 2000 significantly under-represented the seriousness of his

---

[4]Barnes's suggestion that if he had served "just 20 days less on this offense, it would not count at all," *see* Barnes Sentencing Memo at 10, is mistaken.  Had Barnes been committed to DYS for less than 60 days, the offenses would have been scored as one criminal history point under U.S.S.G. § 4A1.2(d)(2)(B).  Under that scenario, Barnes would have seven criminal history points, which still would place him within CHC IV.

[5]While this case was later dismissed, it is interesting to note that one of the charges involved having a firearm on school grounds.  *See* PSR at ¶ 71.

[6]This is the case that was dismissed in May 2000 and that apparently was the linchpin for Barnes's release from DYS custody.  *See* PSR at ¶ 71a.

[7]This juvenile case was later dismissed.  *See* PSR at ¶ 72.

[8]This juvenile case also resulted in a continuance without a finding.  On April 5, 2000, however, the court revoked this disposition, adjudicated Barnes delinquent, and placed the case on file.  *See* PSR at ¶ 62.  While the Probation Department has not scored this case, the government believes that it should receive one criminal history point similar to a "guilty-filed" disposition for an adult.  In any event, it makes no difference since Barnes still would be within CHC IV if the case was scored.

[9]This juvenile case was later dismissed.

criminality and/or the risk of his recidivism. This Court should reject Barnes's current suggestion that it simply ignore this information.

### Section 3553(a) Factors

In his sentencing memorandum, Barnes points to his history and characteristics in support of his argument that he should receive a sentence of time served. First, Barnes relies upon the fact that he had a disadvantaged upbringing. That argument actually cuts in favor of the government since growing up "on the street" is closely associated with future recidivism. Accordingly, this information supports the view that Barnes should remain incarcerated in order "to protect the public from further crimes of the defendant." 18 U.S.C. §3553(a)(2)(C).

Barnes's criminal history, moreover, is much more serious than Barnes has acknowledged before this Court. Approximately two months after his release from DYS custody on May 30, 2000, Barnes was arrested and charged in the Roxbury District Court with breaking and entering in the daytime, possession of burglarious tools, and receiving stolen property. *See* PSR at ¶ 63. In October 2000, he pleaded guilty and he was sentenced to one year in the House of Correction, suspended for two years. Barnes thus received somewhat lenient treatment similar to what he had received on his juvenile cases. Again, however, Barnes violated the terms of his probation by committing new offenses

(see below), resulting in the imposition of a committed sentence on October 8, 2002 of one year in the House of Correction.

While Barnes was under the supervision of the Probation Department of the Roxbury District Court in the above case, he was arrested and charged in the Dorchester District Court with possession of cocaine with intent to distribute and with commission of a drug crime in a school zone. *See* PSR at ¶ 64. Significantly, the Boston police made a traffic stop of a Honda Civic in the early-morning hours of February 9, 2002. The car was being driven by Hester and Barnes was sitting in the front passenger seat.[10] The police observed and recovered 17 small bags of suspected crack cocaine on the gear box between Hester and Barnes. Barnes pleaded guilty to a reduced charge of simple possession but he was sentenced to six months' imprisonment, on and after the one-year sentence imposed in the above case.

Barnes was released from the House of Correction on or about October 6, 2003. On November 29, 2003, Barnes was arrested by the Brockton Police Department and charged with possession of marijuana and motor vehicle charges. Barnes was released on $500 cash bail on this case and he was on pretrial release on this case when he sold cocaine to Agent DiTullio on April 12, 2004. The Guidelines "encourage" a sentencing court to depart upward

---

[10]Barnes's brother, Eric Barnes, was seated in the rear passenger seat.

when a defendant commits a federal crime while he is pending trial on another charge.  *See* U.S.S.G. § 4A1.3(a)(2)(D).[11]

Even more ominous is the fact that in March 2002, Barnes was arrested and charged in the Dorchester District Court with armed assault with intent to murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and unlawfully carrying a firearm.  *See* PSR at ¶ 70.  These charges arise from an incident that occurred on the night of March 17, 2002 in which Barnes allegedly shot a woman in the head while attempting to shoot somebody else.  This incident occurred while Barnes was under the supervision of the Roxbury District Court on the above case.  Barnes was later indicted for these offenses in the Suffolk Superior Court and he was on pretrial release on this case when he sold cocaine to Agent DiTullio on April 12, 2004.  This serious case is still pending against Barnes.

In sum, in his relatively-short criminal career, Barnes has displayed a propensity for violating the conditions of his probation and for committing new crimes while on probation or pretrial release for earlier offenses.  This is the classic pattern of a recidivist.  Lenient treatment by the state courts

---

[11] The Probation Department has reported that this case was dismissed on June 22, 2004.  *See* PSR at ¶ 78.  According to court records, however, the only charge dismissed on that date was a school zone violation.  The drug and motor vehicle charges are still pending.

14

have failed to deter Barnes from committing crimes or to instill in him a respect for the law.  This Court should not repeat those mistakes.  Rather, it should impose a sentence of substantial incarceration to achieve the purposes set forth in 18 U.S.C. § 3553(a)(2).

## Conclusion

For the reasons set forth above, the government respectfully suggests that it reject the notion of a sentence of time served and that it sentence Barnes to a term of substantial incarceration in this case.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/Michael J. Pelgro
      Michael J. Pelgro
      David G. Tobin
      Assistant U.S. Attorneys

DATED:     February 17, 2005.